THE STATE OF NEW JERSEY v. SAMUEL WEINBERGER ET AL.

Argued February 18, 1915—Decided June 23, 1915.

Where the testimony in an action in ejectment presents a case for the plaintiff based upon mathematical surveys, maps and photographs, supported by the evidence of expert witnesses who made them at the time in controversy, as well as by the testimony of witnesses corroborating them, by which the boundary lines defining the *locus in quo* are clearly and unmistakably established, and the only testimony in opposition thereto is furnished by the memories of witnesses after a lapse of twenty-five years, during which period the conformation of the *locus* has been altered and changed—*Held*, that a verdict based upon the accuracy of the latter testimony is against the weight of the evidence.

---

In ejectment. On rule to show cause to Passaic Circuit. Nine cases argued by consent together.

Before GUMMERE, CHIEF JUSTICE, and Justices GARRISON and MINTURN.

For the plaintiff, *John W. Wescott,* attorney-general, *George L. Record, Albert O. Miller, Jr.,* and *Fisher Anderson.*

For the defendants, *Gilbert Collins, Peter McGinnis, John N. Ward, Harry H. Weinberger* and *Charles Hershenstein.*

The opinion of the court was delivered by

MINTURN, J. The suit was instituted in the name of the state to recover in ejectment a tract of land formerly under the tidal waters of the Passaic, and known as "The Slank." The city obtained a grant for the *locus* from the riparian commissioners in virtue of an enabling act for that purpose. The land lies practically at the foot of an embankment, and at all times was low marshy ground when not flooded by the tide, prior to its filling in by the people of the locality, who used it as a common dumping ground.

The city acquired Dundee island, located in the middle of the river as a park, and determined to extend the lines of the park so as to include the slank. If the *locus in quo* was originally land covered by tidal waters, its filling without authority could not divest the state of its title. *Weinberger* v. *Passaic,* 84 N. J. L. 149.

The question at issue is intended to determine the easterly limit of the low ground, and the width of the channel of the west branch of the Passaic as it encircled Dundee island by its two branches at this point before the channel had been changed by filling in. The state offered in evidence two surveys, one made in 1875 for the Dundee Water Power Company from which company defendants claimed title by various grants. This survey was made by a competent engineer and was intended to mark the lines of the company's title.

The other map was made for the city in 1893 for the purpose of locating the taxable lands of the municipality. This was supplemented by the field notes and the testimony of those who assisted in making the survey.

The city engineer, who for many years made surveys in the neighborhood, and a contractor for the city who was em-

ployed to fill in Fifth street across the slank, as well as other witnesses, testified to the situation as it existed when the maps were made and corroborated the conditions as thereon shown. This testimony was further supplemented by two photographs taken in 1901 and 1902, which depict the situation as presented on the maps.

Mr. Lindsley, the surveyor who made the maps for the Dundee company in 1875, gave in detail an account of the manner in which the survey was made, and the manner by which he determined high tide levels. In the same manner he testified he located the banks of the river by actual soundings, levels and observation at the time. Mr. Wise, who made the assessment map in 1893, for the city, testified from data, observation and measurements, made upon the ground in pursuance of his contract with the city. His testimony was supported by his field-notes, and by the assistants who were with him, four in number, when he made the survey.

The result of the survey was a map which has been used by the city as a basis for assessment purposes since it was filed. No substantial or effectual attack has been made upon the accuracy of these maps. Presumably from their age and authenticity they have been made the basis of defining lines of property for the transfer of land titles in the locality. It cannot be said of the Dundee company map as was said in the case of *Shapiro* v. *Roosevelt,* 85 *N. J. L.* 626, that it is *res inter alois acta,* for it was clearly a map made by an interested party from whom defendants deliver title for the purpose of defining its property lines with reference to the *locus* and presumably of leaving nothing unclaimed that reasonably or legally could be claimed under the title of the company.

So it may be said of the city map that it was made for a public purpose to delineate the extent of the territory which was within the municipal bounds, including the *locus* and which therefore became subject to assessment for municipal purposes. Maps made under such circumstances are clearly admissible in evidence for the purpose of tracing and fixing boundary lines. 1 *Greenl. Ev.* 169.

Many witnesses who testified from their recollection of the location fortified this proof and quite definitely fixed the line of high-water mark at the line claimed by the plaintiff, as shown on the maps.

Opposed to this proof the defendants produced witnesses whose testimony depended only for its reliability upon the vague medium of a memory dimmed to some extent, we must assume, by the passage of practically a quarter of a century.

The testimony of these witnesses need not be assailed or minimized more than to state that as against the unchangeable record of the maps, fortified by the testimony of the men who made them, and also the photographs presenting a comprehensive view of the *locus in quo,* the proverbial frailty inherent in human memory, uncorroborated as to dimensions and unfortified by any claim to exactitude or certainty by written data, has never been able to control or dominate the judgment in any branch of law or science.

Contrasting these two species of evidence, a writer of distinction says: "The writing has the advantage of permanence, it will not decay so soon as the memory of the witness. *Vox andita perit; litera scripta manet."* 1 *Best Ev.* 418.

It is this characteristic of artificial permanency or indestructibility, presenting mathematical exactness, and created for the distinct purpose of avoiding uncertainty or mistake, compared with the transitory impression made upon the human memory of men upon whom no duty or responsibility is cast, and at a period when neither the necessity for observation is clearly apparent, nor the reason for charging the memory as to the existence of an existing order of things is not manifested by personal or selfish interest in the subject-matter involved, that gives superiority and preference as testimony in every human tribunal to the written word as against the vagueness of memory or tradition, when lapse of time may have changed not only the observer but the object seen. 1 *Brown Phil.* 88.

It may also be observed in this connection, that the weight of the evidence is not dependent upon the number of witnesses, but rather upon the character and quality of the tes-

timony adduced by them. *Goldman* v. *Central Railroad,* 79 *N. J. L.* 205; *Floersch* v. *Donnell,* 82 *Id.* 357.

Considerations of this character, it is safe to say, leading upon the one side to certainty and positiveness, which cross-examination has been unable to shake or disturb, because of its stability, its character and quality, and upon the other to the frailty inherent in all human testimony dependent upon the vagueness and uncertainty of memory after a long period of uninterested and unvitalized quiescence, would persuade any judge sitting alone to determine the matter in issue in favor of the claim fortified by certainty and exactness.

These considerations lead us to conclude that the verdict in this case is against the clear weight of the evidence, and that a *venire de novo* should issue.